UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:                          )
                                )
EBW Laser, Inc.,                )        Case No. 05-10220C-7G
                                )
        Debtor.                 )
_____ )
                                )
EBW, Inc.,                      )        Case No. 05-10221C-7G
                                )
        Debtor.                 )
                                )

MEMORANDUM OPINION

These cases came before the court on April 24, 2012, for hearing on the Motion for Relief Due to Violations of the Barton Doctrine and to Show Cause ("Motion for Relief") (Docket #419), the Supplement to Trustee's Motion for Relief Due to Violations of the Barton Doctrine and to Show Cause ("Supplement") (Docket #424) and the Second Supplement to, and Renewal of, Trustee's Motion for Relief and to Show Cause ("Second Supplement") (Docket #484), all of which were filed by Charles M. Ivey, III, the Chapter 7 Trustee ("Trustee") in these cases. Jeffrey E. Oleynik and John W. Ormand III appeared on behalf of the Trustee, K.E. Krispen Culbertson appeared on behalf of James Mark McDaniel, Jr. and C. Richard Epes, and Douglas S. Harris appeared pro se. Having considered the Motion for Relief and the Supplement, the briefs submitted in support of and in opposition to the Motion for Relief and the Supplement, the evidence offered by the parties and the arguments presented on behalf of the parties, the court makes the following

findings of fact and conclusions of law pursuant to Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure.

MATTERS BEFORE THE COURT

The Motion for Relief seeks an adjudication that James Mark McDaniel, Jr., C. Richard Epes, and Douglas S. Harris ("Respondents") violated the Barton Doctrine by instituting a lawsuit in the Superior Court of Guilford County on June 11, 2009, without first obtaining leave from the bankruptcy court, against the attorneys representing the Trustee in an adversary proceeding instituted by the Trustee and in which the defendants include James Mark McDaniel and C. Richard Epes ("McDaniel and Epes"). The relief sought by the Trustee is (1) an injunction against the Respondents enjoining them from prosecuting or commencing any suit against the Trustee or his attorneys or other agents that has any connection with these bankruptcy cases or the pending adversary proceeding and (2) an award of damages and/or sanctions to the Trustee for the Respondents' ongoing violation of the Barton Doctrine and for the manner in which they have hindered, delayed and harmed the administration of the Debtors' estates. The Supplement asserts that Respondents McDaniel and Epes further violated the Barton Doctrine by instituting a lawsuit in state court against an accounting firm that supplied information to the Trustee and renews the prayer for injunctive relief and an award of

damages and/or sanctions against Respondents McDaniel and Epes.[1]

FACTUAL BACKGROUND

Respondents McDaniel and Epes were principals and officers of the Debtors, EBW, Inc. and EBW Laser, Inc., when the Debtors sought relief under Chapter 11 in January of 2005. Both cases subsequently were converted to cases under chapter 7 and Charles M. Ivey, III was named as chapter 7 trustee for both Debtors.

In January of 2007, Mr. Ivey, in the capacity of chapter 7 trustee for the Debtors, instituted an adversary proceeding against Respondents McDaniel and Epes and certain other parties (A.P. 07-2004). The Trustee is represented in that adversary proceeding by the law firm of Ivey, McClellan, Gatton & Talcott, L.L.P. ("IMGT"). The attorneys in IMGT who have acted on behalf of the Trustee during the course of the adversary proceeding include Edwin R. Gatton, John M. Blust and Dirk Siegmund.

The complaint in the foregoing adversary proceeding contains claims alleging fraudulent transfers, preferential transfers, unauthorized post-petition transfers, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and unfair and

---

[1] The Motion for Relief also requests that Mr. Harris be held in contempt and sanctioned for violating the terms of a permanent injunction that the Trustee previously obtained against Mr. Harris in adversary proceeding no. 06-2082. The Second Supplement asserts additional violations of the permanent injunction by Mr. Harris. These claims against Mr. Harris were not considered at the hearing on April 24, 2012, and will be heard in a separate hearing at a later date.

- 3 -

deceptive trade practices. These claims arise out of various alleged transactions and conduct on the part of Respondents McDaniel and Epes involving the Debtors. There was extensive discovery during the course of the adversary proceeding that extended into August of 2008. During discovery, a controversy arose regarding certain 2002 and 2003 tax documents ("the tax documents") that were produced by the attorneys for the Trustee at several depositions and provided to their expert witnesses. The authenticity of the tax documents was challenged by counsel for Respondents McDaniel and Epes after they were produced by the Trustee's attorneys.

Following the completion of discovery, both sides filed motions for summary judgment in September of 2008. On January 15, 2009, a memorandum opinion was filed and orders were entered in the adversary proceeding denying the plaintiff's motion for summary judgment, granting the motion for summary judgment filed by McDaniel, Epes and the other defendants as to certain of plaintiff's claims and denying the motion as to the remaining claims in the adversary proceeding.

On February 17, 2009, the defendants in the adversary proceeding, including Respondents McDaniel and Epes, filed a motion to withdraw the reference of the adversary proceeding (AP Docket #208). No relief was sought by McDaniel and Epes regarding the disputed tax documents during the interval between the ruling on

the summary judgment motions and the filing of the motion to withdraw the reference nor was any issue regarding the tax documents raised in the motion to withdraw the reference. Instead, the motion to withdraw the reference states that "[a]ll discovery in this matter has been completed" and that "[t]his matter is now ready for trial. . . ." At the time these statements were made Respondents McDaniel and Epes were fully aware that the tax documents had not been produced by the defendants in the adversary proceeding, that the tax documents were not the actual tax returns for EBW for the years 2002 and 2003, and also were fully aware that the tax documents had been furnished to and considered by the Trustee's expert witnesses. As evidenced by correspondence from their attorney at the close of discovery, Respondents McDaniel and Epes nonetheless apparently were content to proceed to trial without further inquiry or discovery regarding the tax documents. In particular, in an August 19, 2008 letter to Mr. Gatton (Exhibit F, defendants' Brief in Support of Rule 37 Motion; AP Docket #257), after asserting that the tax documents were not prepared for EBW or produced by the defendants during discovery, the attorney representing McDaniel and Epes in the adversary proceeding stated that he was not going to seek to reopen discovery to reach the issues of "when, why and how the purported 2002 and 2003 tax returns were created or how you obtained them." Consistent with these earlier representations, McDaniel, Epes and the other

defendants in the adversary proceeding filed a designation of record and brief in support of the motion to withdraw the reference, which was followed by the motion to withdraw the reference being docketed in the district court on April 30, 2009.

In June of 2009, McDaniel and Epes abruptly took an entirely different tack regarding the tax documents that had surfaced during discovery in the adversary proceeding. On June 11, 2009, McDaniel and Epes, with Respondent Harris acting as their attorney, filed a civil action against Messrs. Gatton, Blust and Siegmund and IMGT (the "IMGT action") alleging claims for civil obstruction of justice and conversion. Although the complaint alleged that the events giving rise to these claims "occurred incidental to the adversary proceeding" that was pending in the bankruptcy court, the IMGT action was filed without seeking relief in the bankruptcy court and without notice to or authorization from the bankruptcy court. According to the complaint in the IMGT action, during the course of discovery in the adversary proceeding the attorneys for the Trustee engaged in fraudulent conduct involving the tax documents, including an allegation that they knew that the tax documents were "bogus" and had used the "bogus tax documents" to "dupe" their own experts and work a fraud on the bankruptcy court in the adversary proceeding. It is the IMGT action that initiated the violation of the Barton Doctrine alleged in the Motion for Relief that is now before the court.

On July 13, 2009, the IMGT action was removed to the United States District Court for the Middle District of North Carolina by the IMGT attorneys named as defendants in the suit ("Trustee Law Firm Defendants").   On August 10, 2009, the Trustee Law Firm Defendants filed a motion in the district court to dismiss the suit filed by McDaniel and Epes for lack of subject matter jurisdiction based upon the Barton Doctrine.  Under the Barton Doctrine, before another court may obtain jurisdiction over a suit filed against a trustee or a trustee's professionals for acts committed in their official capacity, the plaintiff must obtain leave of the court that appointed the trustee.[2]   On January 8, 2010, following briefing and arguments, Magistrate Judge Trevor Sharp issued a ruling in which he concluded that the Barton Doctrine was applicable and recommended that the motion to dismiss for lack of jurisdiction be granted by the district judge.  On March 31, 2010, District Judge James A. Beaty entered an order and judgment accepting the recommendations of the magistrate judge dismissing the IMGT action.   This ruling was followed by a motion for reconsideration that was filed by Respondent Harris on behalf of McDaniel and Epes, which was denied by Judge Beaty on June 8, 2010. The denial of the motion for reconsideration was followed by an

---

[2]Barton v. Barbour, 104 U.S. 126, 26 LEd. 672 (1881); In re Crown Vantage, Inc., 421 F.3d 963 (9th Cir. 2005); Muratore v. Darr, 375 F.3d 140 (1st Cir. 2004); Carter v. Rodgers, 220 F.3d 1249 (11th Cir. 2000).

appeal by McDaniel and Epes to the United States Court of Appeals for the Fourth Circuit. Following briefing and arguments in the Court of Appeals, an opinion was issued by the Court of Appeals on February 9, 2012, concluding that the District Court had properly applied the Barton Doctrine and affirming the dismissal of the IMGT action brought by Respondents McDaniel and Epes.

ANALYSIS

The Trustee contends that the judgment of the District Court dismissing the IMGT action and the affirmance of that dismissal by the Court of Appeals is preclusive in this proceeding and establishes as a matter of law that the IMBT action was filed in contravention of the Barton Doctrine. Specifically, the Trustee argues that under the doctrine of collateral estoppel, the judgment in the IMGT action is conclusive in this proceeding on the issue of whether there was a violation of the Barton Doctrine by the Respondents. Because the Trustee is in the position of a claimant who was not a party to the IMGT action, consideration must be given not only to whether the general requirements for collateral estoppel have been established, but also as to whether the application of collateral estoppel is permissible in this proceeding, given the fact that the Trustee was not a party to the IMGT action.

1.   Requirements of Collateral Estoppel

Under res judicata principles, a prior judgment involving the

same parties can preclude subsequent litigation on those matters actually and necessarily resolved in the first adjudication. <u>See</u> <u>generally</u> Restatement (Second) of Judgments, §§ 13 <u>et seq</u> (1982); <u>Federal Deposit Ins. Corp. v. Jones</u>, 846 F.2d 221, 234-35 (4th Cir. 1988). "The doctrine encompasses two concepts: claim preclusion and issue preclusion, or collateral estoppel." <u>In re Varat Enter.,</u> <u>Inc.</u>, 81 F.3d 1310, 1315 (4th Cir. 1996). These concepts are part of the federal common law and may be invoked in cases or proceedings in the federal courts involving federal questions, including proceedings in the bankruptcy courts. <u>See Semtek Int'l</u> <u>Inc. v. Lockheed Martin Corp.</u>, 531 U.S. 497, 507-08, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001); <u>Varat</u>, 81 F.3d at 1315 ("The doctrine of res judicata applies in the bankruptcy context.").

Collateral estoppel, also known as issue preclusion, prevents relitigation of issues decided in a prior case. <u>Montana v. United</u> <u>States</u>, 440 U.S. 147, 153, 99 S. Ct. 970, 973, 59 L. Ed. 2d 210, 217 (1979). Therefore, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits . . . ." (citation omitted). <u>Id.</u> In the Fourth Circuit, a party must establish five elements to invoke collateral estoppel:

> (1) that "the issue sought to be precluded is identical to one previously litigated" ("element one"); (2) that the issue was actually determined in the prior proceeding ("element two"); (3) that the issue's determination was "a critical and necessary

part of the decision in the prior proceeding"
("element three"); (4) that the prior judgment
is final and valid ("element four"); and (5)
that the party against whom collateral
estoppel is asserted "had a full and fair
opportunity to litigate the issue in the
previous forum" ("element five").

Collins v. Pond Creek Mining Co., 468 F.3d 213, 217-18 (4th Cir.

2006) (citation omitted). All of these elements have been

established by the Trustee.

The requirement of the first element that the issues be

identical clearly is satisfied. The issue in this proceeding is

whether the Respondents violated the Barton Doctrine by filing the

IMGT action. That is the same issue that was presented when the

IMGT action was dismissed.

The requirement of the second element that the issue actually

have been determined in the prior proceeding likewise is satisfied.

The district court dismissed the Respondents' complaint for lack of

subject matter jurisdiction based upon a finding that the IMGT

action was a violation of the Barton Doctrine as a result of the

failure to obtain leave from bankruptcy court before filing the

IMGT action. McDaniel v. Blust, 668 F.3d 153, 156 (4th Cir. 2012).

The Court of Appeals affirmed the District Court's dismissal on the

same grounds. Id. at 158. Thus, the issue of whether there was a

violation of the Barton Doctrine was actually determined because it

was the basis of the adjudication that there was a lack of

jurisdiction.

- 10 -

Because the determination that the IMGT action was filed in contravention of the Barton Doctrine formed the basis of the dismissal, it certainly was a critical and necessary part of the decision in the IMGT action as required under the third element.

The fourth element also is present because the dismissal by the district court was a final, valid judgment that was subsequently affirmed on appeal. Although Respondent Harris proffered in oral argument that he might file a petition for a writ of certiorari from the Supreme Court, the prospect of such a petition does not limit the preclusive effect of the district court's dismissal. A prior valid judgment is given preclusive effect even if the judgment remains appealable. 18 Moore's Fed. Prac. § 132.03 [4] [k] [vii] (3d ed. 2011) (citing Partmar Corp. v. Paramount Pictures Theatres Corp., 347 U.S. 89, 88 n.6, 74 S. Ct. 414, 420, 98 L. Ed. 532, 541 (1954), reh'g denied, 347 U.S. 931, 74 S. Ct. 527, 98 L. Ed. 1083).

The fifth and final element is that there have been a full and fair opportunity to litigate the issue in the prior litigation. McDaniel and Eppes were the plaintiffs in the IMGT action and obviously had a full and fair opportunity to litigate the issue of whether their lawsuit was a violation of the Barton Doctrine. The same is true of Respondent Harris even though he was the attorney and not a party to the IMGT action. In the Fourth Circuit, an attorney-client relationship, by itself, is insufficient to provide

- 11 -

an attorney with a full and fair opportunity to litigate a determined issue in a client's case.  Weinberger v. Tucker, 510 F.3d 486, 493 (4th Cir. 2007), cert. denied, 554 U.S. 903, 128 S. Ct. 2938, 171 L. Ed. 2d 865 (2008).  However, where, as in the IMGT action, there is an identity of interests between the attorney and the client, the attorney-client relationship precludes re-litigation of issues decided in the client's case by the attorney.  Id.  Here, Mr. Harris personally litigated the issue before both the district court and the court of appeals.  His interests were undeniably aligned with the interests of his clients.  The Trustee's Motion for Relief was filed while the IMGT action was being litigated in the district court and provided Mr. Harris with notice of potential sanctions against him, as well as his clients, if the IMGT were found to be a violation of the Barton Doctrine.  It thus was apparent to Mr. Harris that the outcome of the IMGT action might be determinative of whether sanctions would be imposed against him, as well as his clients.

  2. Applicability of Nonmutual Collateral Estoppel

  The question that remains regarding the applicability of collateral estoppel in this proceeding is the impact of the Trustee not having been a party to the IMGT action.  The application of collateral estoppel in the manner sought by the Trustee has been referred to as "offensive nonmutual collateral estoppel."  See Collins v. Pond Creek Mining Co., 468 F.3d 213, 217 n. 4 (4th Cir.

- 12 -

2006) ("Collateral estoppel is 'offensive' when a plaintiff seeks to 'foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully," and it is 'nonmutual' when the party seeking to rely on the earlier ruling was not a party to the earlier proceeding and is not in privity with a party. [citation omitted].""). In Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979), the Supreme Court rejected an argument that the use of offensive nonmutual collateral estoppel should be precluded in the federal courts, opting instead to "grant trial courts broad discretion to determine when it should be applied." Under the Court's ruling, the controlling test to be applied is whether "the application of offensive estoppel would be unfair to a defendant. . . ." Id. The court then discussed a nonexclusive group of factors to be considered in determining whether nonmutual collateral estoppel should be applied, which can been summarized as follows:

> (1) whether the plaintiff could have easily joined in the action against the defendant in the earlier action; (2) whether the defendant had an incentive in the prior action to have defended the action fully and vigorously; (3) whether the defendant had won litigation other than the prior action that determined the same issues or facts favorably to the defendant; (4) whether procedural opportunities are available in the pending action that were not available in the prior action.

Kloth v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litig.), 355 F.3d 322, 326 (4th Cir. 2004) (citing Parklane, 439 U.S. at

331-32, 58 L. Ed. 2d at 561-62, 99 S. Ct. 645 at 650-52). Hence, offensive nonmutual collateral estoppel may be proper, "so long as the plaintiff using the fact could not have easily joined the prior litigation and application of the doctrine would not be unfair to the defendant." Id. at 326-27.

The Parklane factors do not highlight any unfairness to the Respondents resulting from the application of offensive nonmutual collateral estoppel in this proceeding. Although the Trustee knew about the IMGT action, it certainly was not litigation that he could easily have joined and, in fact, there was no basis for the Trustee to do so, given the nature of the claims, the alignment of the parties and the fact that the litigation was unauthorized and illegitimate. Nor is there anything in the record that suggests that there were any strategic considerations on the part of the Trustee that restrained him from intervening in the IMGT action. The IMGT action was litigation which the Respondents vigorously and fully pursued and prosecuted, as reflected by the many motions, request for reconsideration and appeals they filed. Because the Respondents have not previously prevailed against another party on the issue of the Barton Doctrine, there are no inconsistent judgments or risks of such inconsistency. Nor are there any procedural opportunities available in this proceeding that were not available in the IMGT action. The court concludes, therefore, that there is no unfairness associated with applying collateral estoppel

- 14 -

in this proceeding even though the Trustee was not a party to the IMGT action.

Because the Trustee has established all five elements of collateral estoppel and that the application of offensive nonmutual collateral estoppel is not unfair to the Respondents, the Trustee is entitled to an adjudication that collateral estoppel is applicable in this proceeding and that the judgment in the IMGT action is preclusive in this proceeding and establishes as a matter of law that the filing and pursuit of the IMGT action by the Respondents was in contravention of the Barton Doctrine.

      3.    Relief Available as a Result of Respondents'
            Violation of the Barton Doctrine

As explained in <u>Allard v. Weitzman (In re DeLorean Motor Co.)</u>, 991 F.2d 1236 (6th Cir. 1993), two forms of relief are available when a lawsuit has been brought in contravention of the Barton Doctrine. The court ruled that both injunctive relief and the recovery of damages were available where there has been a violation of the Barton Doctrine. In the <u>DeLorean</u> case, the bankruptcy trustee and his attorneys were sued in state court by an individual who had been sued by the trustee. The state court suit was brought without obtaining leave of the bankruptcy court. The trustee then brought a proceeding in the bankruptcy court alleging a violation of the Barton Doctrine seeking to enjoin the prosecution of the state court action and to recover the damages incurred as a result of having to defend against the state court action. The court

upheld both of these claims.  The court held that the trustee's assertion that the unauthorized suit against the trustee and his attorneys would unduly hinder the administration of the bankruptcy estate stated a valid claim for injunctive relief.  In the claim for damages in Count I of his complaint, the trustee in DeLorean sought to recover his "actual damages, including costs and attorneys' fees and administrative expenses, if any, by way of indemnification, incurred as a result of the filing of the Weitzman Action."  Id. at 1241.  In upholding the damages claim, the court stated:

> The Trustee is entitled to the damages that he requested in Count I of his complaint. Furthermore, the Trustee must be given the opportunity to prove the amount of the damages incurred as a result of having to defend against the Weitzman Action including the necessity of the filing of the Trustee's complaint with the Bankruptcy Court in Detroit.

Id. at 1242.  In accord Unencumbered Assets Trust v. Hampton-Stein (In re National Century Financial Enterprises, Inc., 426 B.R. 282 (Bankr. S.D. Ohio 2010); Steffen v. Berman (In re Steffen), 406 B.R. 148 (Bankr. M.D. Fla. 2009); Katz v. Kucel (In re Beibel), No. 08-3115, 2009 WL 1451637 (Bankr. May 20, 2009); In re Byrd, No. 04-35620, 2007 WL 1485441 (Bankr. May 18, 2007).  Thus, where, as in this proceeding, a party has filed a suit in violation of the Barton Doctrine, such party is liable for the damages resulting from such violation, and the recoverable damages include the

- 16 -

attorneys' fees and expenses incurred in opposing the unauthorized suit as well as the attorneys' fees and expenses incurred in bringing the proceeding to recover the damages resulting from the violation.

    4.   Relief Sought in this Case

    Following the institution of the IMGT action by the Respondents, the Trustee filed an application in this court seeking authority to employ special counsel to represent the Trustee and the Trustee Law Firm Defendants regarding the IMGT action. According to the Trustee, the filing of the IMGT action against the Trustee Law Firm Defendants in their capacity as his attorneys in the adversary proceeding pending against Respondents McDaniel and Epes was brought to undermine and impede his efforts to pursue the claims against McDaniel and Epes in the pending adversary proceeding and thus was interfering with his ability to perform his duties as Trustee. Accordingly, the Trustee sought authority to employ special counsel to provide legal advice to the Trustee and the Trustee Law Firm Defendants as to how to appropriately respond to the IMGT action and to represent the Trustee Law Firm Defendants in the IMGT action. The special counsel that the Trustee sought to employ were Jeffrey E. Oleynik and members of his law firm, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP ("Brooks Pierce"). On November 18, 2009, following notice and hearing, an order was entered in this court granting the Trustee's application and

authorizing the Trustee to employ Brooks Pierce as special counsel to represent the Trustee and the Trustee Law Firm Defendants in the IMGT action and in all matters ancillary and coincident thereto as requested in the Trustee's application.

In their capacity as special counsel, attorneys in the Brooks Pierce law firm represented the Trustee Law Firm Defendants throughout the protracted and contentious course of the IMGT action. The attorneys who were primarily responsible for defending the IMGT action were Messrs. Oleynik and Ormand who worked on the matter from the time it was removed to the United States District Court in June of 2009 until it was finally concluded in the United States Court of Appeals for the Fourth Circuit in March of 2012. The Brooks Pierce attorneys also represented the Trustee in filing and prosecuting the Motion for Relief and the Supplement which are now before the court. The Trustee contends that the attorneys at Brooks Pierce expended 1,256 hours in providing such services for which attorneys' fees of $302,912.50 have been incurred. The Trustee seeks to recover these attorneys' fees from the Respondents together with expenses of $5,048.79 which were incurred by Brooks Pierce. The Trustee also seeks to recover an additional amount for the time expended by the Trustee Law Firm Defendants in assisting with the defense of the IMGT action and the prosecution of the Motion for Relief. The Trustee's evidence showed that the IMGT attorneys expended 420.20 hours in doing so, for which a recovery

of $98,460.50 is sought plus out-of-pocket expenses of $636.09. The Trustee contends that the fees and expenses of Brooks Pierce, as well as the expense of the attorneys in his firm, were incurred solely as a result of the unauthorized filing of the IMGT action by the Respondents in violation of the Barton Doctrine, that such fees and expenses were a foreseeable consequence of the filing and pursuit of the IMGT action by the Respondents and that the Respondents therefore are liable for all such fees and expenses.[3]

The record fully supports the Trustee's contention that the employment of Brooks Pierce was necessitated by the filing of the IMGT action by the Respondents and that extensive services were provided by the Brooks Pierce attorneys as a result of the Respondents having filed the IMGT action. Moreover, it clearly was foreseeable by the Respondents that the filing of the IMGT action would result in the opposing parties employing counsel to defend the IMGT action and incur attorneys' fees and expenses in doing so. It follows that the Trustee is entitled to recover from the Respondents the reasonable and necessary attorneys' fees and expenses incurred as a result of the filing of the IMGT action.

In Harman v. Levin, 772 F.2d 1150, 1152 (4th Cir. 1985), the Court of Appeals for the Fourth Circuit held that in making a

---

[3]The Trustee also sought injunctive relief in his Claim for Relief regarding the IMGT action. However, the IMGT action was dismissed after the Claim for Relief was filed and the claim for injunctive relief thus has become moot and need not be addressed.

- 19 -

determination regarding an award of attorney's fees, the court's analysis should include the twelve factors which are set forth in Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir. 1978). These factors, which were adopted from Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), are as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to properly perform the legal services; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances of the engagement; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[4] The procedure for making the Johnson analysis is explained in Daly v. Hill, 790 F.2d 1071, 1078 (4th Cir. 1986), where the court pointed out that the proper point at which the Johnson factors are to be considered is at the outset in determining reasonable hourly rates and the reasonable hours.

_____

[4]There is a close relationship between the Johnson factors and section 330 of the Bankruptcy Code. In explaining this relationship, the court in Harman observed that the twelve Johnson factors are a "parallel but more detailed approach to addressing the important considerations involved in setting attorney's fees. . . ." 772 F.2d at 1152.

In accordance with the foregoing authorities, the first step in dealing with the fee application now before the court is to establish the lodestar figure which involves the court determining reasonable hourly rates and the number of hours reasonably required for the services through the application of the twelve Johnson factors.   The second step involved in the process is to then determine whether there are any exceptional circumstances which were not addressed in the court's twelve-factor analysis which warrant any adjustment of the lodestar figure.

The first of the Johnson factors involves a consideration of the time and labor involved in the case.   This requires an examination of the work performed and a determination of whether the work performed is legal work and whether the amount of time spent in doing the work is reasonable.   In making this evaluation, the court should take into account whether the services were necessary, whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue or task addressed by each particular service and that the court ascertain and eliminate any services that are ministerial or nonlegal and any unnecessary duplication of services by the attorneys who performed services in the case.   If counsel has not exercised "billing judgment" and excluded from the itemization of services hours that are excessive, redundant or otherwise unnecessary, then the court should impose such "billing

judgment" itself by eliminating any such time.  See Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983).

The analysis of the requested fees and expenses will begin with the attorneys' fees and expenses of the Brooks Pierce law firm.  Using the criteria described above, the court will first consider whether the services provided by Brooks Pierce involved necessary legal work that was performed in a reasonable amount of time.

As reflected on Trustee's Exhibit No. 3, the total number of hours billed by Brooks Pierce is 1,256.35 hours.  However, not all those hours are related to matters arising out of the Respondents' violation of the Barton Doctrine.  Some of the attorneys' time is related to the claim for sanctions against Mr. Harris for allegedly violating an earlier injunction entered by this court in adversary proceeding 06-2082 ("the injunction matters").  The number of hours related to the injunction matters total 202.5 hours and account for fees totaling $49,079.[5]  A second adjustment involves the time that was spent by Brooks Pierce related to the civil action that McDaniel and Epes filed against the Bernard Robinson accounting firm.  The Trustee contends that the suit against Bernard Robinson

---

[5]See Item B on page 4 of Trustee Exhibit 3 (12.9 hours) and Items G (75.2 hours), Item H (66.9 hours) and Item I (47.5 hours) on page 5 of Trustee Exhibit 3.  These items will be dealt with when the injunction matters involving Mr. Harris are addressed.

- 22 -

also constituted a violation of the Barton Doctrine.  The Trustee's evidence was insufficient to establish such a violation.   Unlike the IMGT attorneys, the Bernard Robinson accounting firm was never employed as a professional of the Trustee and while Bernard Robinson supplied tax documents to the IMGT attorneys, it appears that it did so only as a former accountant of the Debtors and not as an agent or representative employed by the Trustee.  Because the evidence did not establish that the Bernard Robinson lawsuit was a violation of the Barton Doctrine, the fees related to that matter will not be allowed as damages for which the Respondents are liable.   The number of hours related to the Bernard Robinson lawsuit total 39.15 and account for fees totaling $9,657.50.[6]  The remaining 1,014.7 hours of services provided by the Brooks Pierce attorneys, which account for fees of $244,176, involve services that are related to matters arising out or resulting from the Respondents' violation of the Barton Doctrine.   The services encompassed within those hours began in June of 2010 when the Respondents sent the Trustee a copy of the complaint they intended to file.  The services of the Brooks firm thereafter continued from that point until the IMGT action was finally concluded in March of 2012 when the Court of Appeals denied the Respondents' petition for en banc rehearing and entered its final mandate.   Throughout the

---

[6]See Item C., 1 on page 3 of Trustee Exhibit 3 (11.6 hours) and Item E. on page 4 of Trustee Exhibit 3 (27.55 hours).

litigation, the Brooks Pierce firm represented the Trustee Law Firm Defendants in the IMGT action.  The services began with a review of the complaint filed by the Respondents and legal research regarding the legal issues raised by the filing of the IMGT action, including the Barton Doctrine and its scope, and analyzing the proper response on behalf of the defendants.  Also, in order to properly evaluate the claims alleged in the IMGT action and to determine the strategy to be employed in representing the Trustee and Trustee Law Firm Defendants, it was necessary for the Brooks Pierce attorneys to become familiar with this bankruptcy case as well as the adversary proceeding that had been filed against Respondents McDaniel and Epes.  There already was an extensive history as to both the bankruptcy case and the adversary proceeding and considerable time conferring with the Trustee and his attorneys as well as reviewing the voluminous pleadings, motions, discovery, etc., was required on the part of the Brooks Pierce attorneys in order to gain the needed familiarity.  Having completed this preliminary work and having concluded that the IMGT action should be removed from the state court to the United States District Court, the attorneys prepared and filed the required documents in order to effect the removal.  The attorneys then prepared and briefed a motion to dismiss the IMGT action for lack of subject matter jurisdiction.  When the Respondents filed a motion to remand the IMGT action to the state court, the attorneys were required to

respond to the motion and to file a brief in opposition to the motion to remand.    At the completion of the briefing, the Magistrate Judge issued a recommendation that the motion to remand be denied and that the motion to dismiss be granted as to the IMGT defendants.    This ruling was followed by a brief from the Respondents in opposition to the Magistrate Judge's recommendation which required further briefing by the Brooks Pierce attorneys.    On March 31, 2010, Chief District Judge Beaty, in accordance with the Magistrate Judge's recommendation, denied the motion to remand and dismissed the IMGT action as to the Trustee Law Firm Defendants. This ruling was followed by the filing of a Rule 60 motion by the Respondents seeking reconsideration of Judge Beaty's ruling.    This motion by the Respondents necessitated a response and brief in opposition to the Rule 60 motion.    Following the denial of the Rule 60 motion in the District Court, the Respondents gave notice of appeal and in due course perfected an appeal to the United States Court of Appeals for the Fourth Circuit.    The services of the Brooks Pierce firm continued with respect to the appeal, and included the preparation and printing of the appeal appendix and the other required filings, including the briefing required for the appeal.    While the appeal was pending in the Court of Appeals, the Brooks Pierce attorneys participated in two days of court-ordered mediation.    When the mediation resulted in an impasse, the appeal was activated and oral arguments were scheduled and presented in

the Court of Appeals in Richmond, Virginia. On February 9, 2012, the Court of Appeals issued its opinion ruling that the Barton Doctrine was applicable with respect to the IMGT action and affirming the dismissal of the IMGT action. This ruling was followed by still another motion by the Respondents, this time a petition for rehearing and rehearing en banc before the Court of Appeals. Following the denial of this motion, the final mandate of the Court of Appeals was entered on March 14, 2012, finally marking the conclusion of the IMGT action.

In addition to providing services related to the defense of the IMGT action, the Brooks Pierce firm also provided services related to the filing and prosecution of the Motion for Relief which is now before the court. Brooks Pierce prepared and filed the Motion for Relief and has submitted various briefs in support of the Motion for Relief. Brooks Pierce also has appeared for various status hearings regarding the Motion for Relief as well as the contested hearing on the Motion for Relief on April 24, 2012, which required extensive preparation.

In order to better understand the full extent of the Barton Doctrine services that have been required of the Brooks Pierce firm as special counsel for the Trustee and the Trustee Law Firm Defendants and the amount of time required in order to do so, it is helpful to consider the context provided by the chronology set forth on attached Addendum No. 1 regarding the proceedings and the

resultant legal services spawned by the filing of the IMGT action.

The 1,014.7 hours of services related to Barton matter which were provided by the Brooks Pierce attorneys consisted of legal work which was necessary and appropriate in order to adequately represent the Trustee and the Trustee Law Firm Defendants in the IMGT action and with respect to the Motion for Relief and Supplement. Moreover, the services provided by Brooks Pierce were performed in a reasonable amount of time, considering the complexity and importance of the issues and tasks addressed by the various services. This factor does not warrant any adjustment in the number of hours included in the Application for the Barton Doctrine services.

The second Johnson factor involves the novelty and difficulty of the questions or work involved in the case. Although the issues presented by the Barton Doctrine may not be novel, it is safe to say that the Barton Doctrine arises infrequently and that questions regarding its applicability and scope are matters that require research and briefing when such questions do arise. It therefore was reasonable for the Brooks Pierce to conduct the legal research and briefing reflected in the description of their services. A related factor that had an impact on the number of hours that were required of the Brooks Pierce attorneys that could be characterized as a "difficulty" was the unabating and dogged tenacity which the Respondents exhibited throughout the entire litigation. Each

ruling in the IMGT action was followed by a motion and brief seeking reconsideration or rehearing. Such a strategy on the part of one party necessarily has the effect of increasing the time and expense required of the other party and such was the case in the IMGT action. While these and the other circumstances of this case, do not warrant an upward adjustment of hourly rates, they do further explain why the number of hours expended by the Brooks Pierce attorneys were required in the IMGT action and also why no downward adjustment is indicated.

The third Johnson factor requires consideration of the skill required to properly perform the legal services provided by the Brooks Pierce attorneys. Most of the work in the IMGT action was performed by Messrs. Oleynik and Ormand. Both of them clearly had the experience and skill to handle the procedural, trial and appellate work that was required in order to represent the defendants in the IMGT action in a proper and successful manner at the hourly rates that were charged.

The fourth Johnson factor deals with whether the employment in this case resulted in preclusion of other employment by the attorneys. This factor involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other

purposes.    There is no evidence that this factor is operative in this proceeding.

The fifth factor in <u>Johnson</u> is the "customary fee" which requires that the court consider "[t]he customary fee for similar work in the community. . . ." <u>Johnson</u>, 488 F.2d at 718. In the context of this case involving employment on an hourly basis, this factor perhaps is more aptly phrased as the "customary hourly rate" and involves consideration of the prevailing market rate of compensation in the relevant market. In the Fourth Circuit the relevant market for determining the prevailing market rate ordinarily is the community in which the court making the determination sits. <u>Rum Creek Coal Sales, Inc. v. Caperton</u>, 31 F.3d 169, 175 (4th Cir. 1994); <u>National Wildlife Fed'n v. Hansen</u>, 859 F.2d 313 (4th Cir. 1988). Consistent with this general rule, the relevant market for determining the customary hourly rate for the services in this case is the local community, <u>i.e.</u>, the Middle District of North Carolina.

The question that remains with respect to the fifth <u>Johnson</u> factor is whether the hourly rates charged by Brooks Pierce in this case fall within the prevailing hourly rates in the Middle District of North Carolina for attorneys of similar skill and ability while engaged in performing the type of work that was performed by Brooks Pierce in this case. In making this comparison, the determination of the prevailing hourly rates in this District may be based on the

personal knowledge of the court regarding prevailing rates in the local market. Rum Creek Coal Sales, 31 F.2d at 179; see also Bank of New York Mellon Trust Co. v. Tysons Finan., LLC (In re Omar Botero-Paramo), No. 11-1886, 2012 WL 2055005 (4th Cir. June 8, 2012). As previously noted, most of the services in the IMGT action were performed by Mr. Oleynik and Mr. Ormand at an hourly rate of $250. During the relevant period, Mr. Oieynik and Mr. Ormand were both partners in Brooks Pierce. The $250 hourly rate was based upon a reduced fee agreement and was well below their regular rates which, for Mr. Oieynik, were $360 in 2009, $370 in 2010 and $380 in 2011 and, for Mr. Ormand, were $300 in 2009, $310 in 2010 and $320 in 2011. During the period when the services were provided by the Brooks Pierce attorneys, the prevailing hourly rates for attorneys comparable to Mr. Oleynik and Mr. Ormand performing work comparable to that performed by them in this case were well in excess of the $250 per hour reduced rate that they charged in this case. The same is true as to Ms. Julia Ambrose, another partner who performed some of the work and who charged at a reduced hourly rate of $225 which was well below her regular hourly rate. Some work also was performed by associates at Brooks Pierce whose time was charged at hourly rates ranging from $125, to $195 and there was some work performed by paralegals whose hourly rates ranged from $95 to $135. These rates fall within the prevailing rates in this District for comparable associates and

paralegals performing the type of work that was performed in this case.

The sixth factor from the <u>Johnson</u> case requires consideration of whether the fee is a fixed or contingent fee as bearing upon what the attorney's expectations were at the beginning of the case. Obviously, in this case Brooks Pierce did not have a contingent fee arrangement and contemplated from the outset that it would be compensated at fixed hourly rates. No adjustment to the customary hourly rate is warranted on the basis of this factor.

The seventh <u>Johnson</u> factor requires consideration of the effect of any time limitations imposed by the client or the circumstances of the case. This factor recognizes that priority work which delays the attorney's other legal work is entitled to some premium. There was no evidence regarding this factor and no request for a premium and, therefore, this factor is not operative in this case.

The eighth factor from the <u>Johnson</u> case requires a consideration of the amount involved in the case and the results obtained by the attorney. Although the issues presented by the filing of the IMGT action were of utmost importance to the Trustee and the results achieved on behalf of the Trustee were highly successful, these considerations do not warrant a departure from the hourly rate that was agreed upon at the outset.

The ninth factor from the <u>Johnson</u> case involves the

experience, reputation and ability of the attorneys.  Although the attorneys who performed the services in this case are highly skilled and experienced and have an excellent reputation, these considerations, likewise, do not warrant a departure from the hourly rate that was agreed upon at the outset.

The tenth factor from the Johnson case requires the court to consider the possible impact of the case being "undesirable." There was no evidence that the representation of the Trustee and the defendants in the IMGT action carried with it any negatives that would adversely impact the attorneys.  Consequently, this factor has no impact in this case.

The eleventh Johnson factor involves the nature and length of the professional relationship with the client.  While the relationship between professionals or "professional courtesy" perhaps played a role in the Brooks Pierce attorneys reducing their regular hourly rates, this Johnson factor does not otherwise appear to be operative.

The twelfth factor from the Johnson case involves the court taking into account awards in similar cases.  This was done in determining what constitutes the prevailing hourly rates in this District under the fifth factor.

Based upon the foregoing analysis, the court finds and concludes that the hourly rates reflected on Trustee's Exhibit No. 3 are reasonable hourly rates of compensation for the attorneys and

paralegals who provided the services and that the number of hours reflected on Exhibit No. 3 were reasonably expended by the attorneys in providing legal services that were necessary in providing the required legal representation to the Trustee and the defendant attorneys in the IMGT action.  The lodestar figure for the services provided by the attorneys is arrived at by multiplying the applicable number of hours times the applicable hourly rates for the various attorneys and paralegals, which yields a lodestar figure of $244,176.  The last step in determining the final compensation for the Brooks Pierce attorneys is for the court to determine whether there are any exceptional circumstances in this case which call for an adjustment of the lodestar figure.  The Trustee has not sought an upward adjustment of the fees and there are no circumstances that call for a downward adjustment of the fees.  Therefore, the lodestar figure of $244,176.00, arrived at as set forth in this opinion, constitutes reasonable compensation for the reasonable and necessary services provided by the Brooks Pierce attorneys on behalf of the Trustee and the defendant attorneys in the IMGT action.  All of the services provided by the Brooks Pierce attorneys and the resulting fees for those services were necessitated by and the proximate result of the Respondents having commenced and pursued the IMGT action in contravention of the Barton Doctrine and, therefore, may be recovered by the Trustee

from the Respondents, jointly and severally.[7]  The same is true of the expenses incurred by the attorneys.  During the course of their representation, Brooks Pierce obtained reimbursement for expenses of $5,048.79 which are itemized on Trustee Exhibit No. 5 and which the court finds were reasonably and necessarily incurred by the attorneys in providing their services.  The Trustee therefore is also entitled to recover from the Respondents the expenses of $5,048.79.

The remainder of the Trustee's claim involves fees and expenses of the IMGT attorneys which the Trustee contends resulted from the filing and pursuit of the IMGT action by the Respondents. The status of the Trustee Law Firm Defendants in the IMGT action obviously was very different from that of the Brooks Pierce attorneys in that the Trustee Law Firm Defendants were litigants

---

[7]Compare In re General Motors Corp., 110 F.3d 1003, 1017 (4th Cir. 1997), where the court ruled in a civil contempt proceeding that where attorneys' fees are being awarded as part of the damages resulting from the violation, "the Court need not directly address the reasonableness of the outside counsel's bills to GM."  Instead, "the Court need only look at the particular tasks, determine if they were indeed caused by [the party who violated the order] and a foreseeable result of his behavior, and determine if the task was a reasonable response."  Under this standard, the scope of the analysis of Brooks Pierce attorneys' fees would be much narrower and would go no further than looking at the tasks performed by the attorneys, determining if they were caused by the filing of the IMBT action and were foreseeable (which they were) and whether the tasks were a reasonable response to the IMGT action (which they were), with the result that the fees should be awarded as damages. Arguably, civil contempt for violating a court order is analogous to a violation of the Barton Doctrine which would mean that the standard articulated in the General Motors case could be applied in this proceeding.

rather than attorneys acting on behalf of a client. Nonetheless, the IMGT action had a heavy impact on the Trustee Law Firm Defendants requiring very substantial expenditures of time which otherwise could have been devoted to performing legal work for clients. Whether the resulting loss is characterized as a claim for attorneys' fees or as damages, it is clear that the IMGT action inflicted a heavy toll upon the Trustee Law Firm Defendants in terms of causing them to expend substantial amounts of billable time in dealing with the IMGT action. Such expenditure of time and resulting loss were the direct and foreseeable result of the unauthorized filing and pursuit of the IMGT action. Consistent with the <u>Johnson</u> analysis used with respect to the Brooks Pierce fees, the amount of such loss and damages will be determined as hereinafter described based primarily upon the attorney time expended by the IMGT attorneys performing work necessitated by the IMGT action and the usual hourly rates for comparable attorneys in this District.

As reflected in the supplemental filing submitted by the Trustee (D.E. 522), the total number of attorney hours involved in this portion of the Trustee's claim is 420.20. However, as with Brooks Pierce, not all of those hours are related to matters arising out of Respondents' violation of the Barton Doctrine. Some of the attorneys' time is related to the injunction matters involving Mr. Harris. The number of hours related to the

injunction matters total 85.50 hours and account for fees totaling $19,439.[8]   The remaining 334.7 hours expended by the IMGT attorneys, which account for fees of $79,021.50, involve work that is related to matters arising out of or resulting from the Trustee Law Firm Defendants being named as defendants in the IMGT action. The work encompassed within those hours began in June of 2009 when the Respondents filed the IMGT action and continued through the hearing on the Motion for Relief on April 24, 2012.

Following the commencement of the IMGT action, the Trustee Law Firm Defendants were involved in the preparation of a motion on behalf of the Trustee to obtain authority to employ special counsel, presenting the motion at a hearing on the motion and preparation of an order granting the motion and authorizing the employment of special counsel.   Thereafter, as with any responsible, prudent party ensnared in civil litigation, the Trustee Law Firm Defendants spent extensive time communicating with special counsel in order to provide special counsel with the information and documents required in order for special counsel to be in a position to effectively represent the Trustee Law Firm Defendants in the IMGT action.   This was particularly time consuming because of the extensive history and background required in order for the special counsel to have a complete and accurate picture of all that was involved in the matters involving the

---

[8]See attached Addendum No. 2.

Respondents.  As previously alluded to, the background included two chapter 7 cases that had been pending since 2005.  The background that was essential also included a dispute with Respondent Harris regarding whether he could ethically represent Respondents Epes and McDaniel in matters in which their interests were adverse to the interests of the corporate Debtors who were Mr. Harris' clients prior to the bankruptcy filings.  This dispute led to the Trustee filing an adversary proceeding against Mr. Harris to prevent him from doing so and obtaining an injunction limiting the professional relationship that Mr. Harris could have with Respondents Epes and McDaniel in matters involving the Debtors.  Also included in the extensive background that preceded the commencement of the IMGT action, was the adversary proceeding in which the Trustee had asserted multiple claims against Respondents Epes and McDaniel and which, itself, had an extensive history.  It was while the Trustee Law Firm Defendants were engaged in pretrial discovery in that adversary proceeding that the misconduct attributed to the Trustee Law Firm Defendants in the IMGT action allegedly occurred, and so it was especially important that the Brooks Pierce attorneys be provided a complete picture regarding that adversary proceeding. Moreover, the adversary proceeding did not remain static after the IMGT action was commenced by the Respondents.  After Magistrate Judge Sharpe issued his recommendation that the IMGT action be dismissed, Respondents Epes and McDaniel filed a motion in the

adversary proceeding seeking sanctions against the Trustee based upon the same tax documents and alleged misconduct as they alleged in the IMGT action.   Developments thus were ongoing in both the adversary proceeding and the IMGT action which required continuing and time-consuming communications and coordination with the Brooks Pierce attorneys by the Trustee Law Firm Defendants.   During the course of the IMGT action, the Trustee Law Firm Defendants assisted with some of the research of the legal issues that arose and reviewed and provided input regarding various motions and briefs that were filed in the IMGT action.

Some of the Trustee Law Firm Defendants attended hearings that were held in the district court in the IMGT action and also attended various status hearings that were held in the bankruptcy court prior to the final disposition of the IMGT action.   Some of the Trustee Law Firm Defendants also were involved in the preparation that was required for the court-ordered mediation in the IMGT action and attended and participated in two days of mediation that were held in the IMGT action.   Some of the Trustee Law Firm Defendants also traveled to Richmond, Virginia, in order to attend the oral arguments in the Court of Appeals.   This type of involvement on the part of the Trustee Law Firm Defendants was reasonable and appropriate for the attorneys as named defendants in the IMGT action.

Following the final disposition of the IMGT action on

March 14, 2012, the Trustee Law Firm Defendants assisted with the preparation for the hearing on the Motion for Relief and appeared at the hearing on April 24, 2012.

Having considered the Trustee's supplemental filing (D.E. 522) and the testimony and other evidence offered at the hearing on April 24, 2012, the court is satisfied and finds that the work performed by the IMGT attorneys consisted of work that was necessary and appropriate for attorneys who were named as defendants in a pending lawsuit. Moreover, considering the issues involved in the IMGT action, the participation required of the IMGT attorneys in order to effectively defend against the claims asserted in the IMGT action and the protracted litigation that was required in order to conclude the IMGT action and to seek recovery of the damages caused by the IMGT action, the work was performed in a reasonable amount of time except that there was some unnecessary duplication of services by the IMGT attorneys where more than one IMGT attorney performed the same work and, to a lesser degree, where an IMGT attorney unnecessarily performed work that duplicated work performed by Brooks Pierce. Based upon the extent of the unnecessary duplication of services, the fees allowed for the work performed by the IMGT attorneys will be reduced by ten percent.

The question that remains is whether the hourly rates sought for the IMGT attorneys fall within the prevailing hourly rates in the Middle District of North Carolina for attorneys of similar

skill and ability performing similar work.  The work included in the Trustee's application was performed by Charles M. Ivey, III, Edwin R. Gatton and James K. Talcott, partners in the IMGT firm, at hourly rates that increased from $210, to $240 to $275 during the three years covered by the application.  The other attorneys who provided services were Dirk K. Siegmund at $240 per hour and John M. Blust at $200 per hour.  Mr. Ivey has practiced law since 1978, Messrs. Gatton, Talcott and Blust each have practiced law in this District for more than 20 years, and Mr. Siegmund has practiced for more than 10 years, and all are experienced, competent, well-regarded practitioners.  The hourly rates charged for these attorneys in the Trustee's application fall within the prevailing rates in this District for comparable attorneys performing the type of work involved in this proceeding.  Based upon the foregoing analysis, the court finds and concludes that the hourly rates reflected in the Trustee's application (D.E. 522) are reasonable hourly rates of compensation for the attorneys who performed the work described in the application and that the number of hours reflected on the application were reasonably expended by the IMGT attorneys in providing work that was necessary and appropriate for them as defendants in the IMGT action.  Based upon the foregoing, the appropriate compensation amount is $71,119.35 which is the $79,021.50 amount sought by the Trustee less the 10% reduction for duplication of services.  In arriving at the $71,119.35 figure, the

court has considered the relevant <u>Johnson</u> factors and is satisfied that no further adjustment of the $71,119.35 amount is required under <u>Johnson</u> in order to arrive at a reasonable and appropriate figure.

All of the work encompassed by the $71,119.35 figure was necessitated by and the proximate result of the Respondents having commenced and pursued the IMGT action in contravention of the Barton Doctrine and, therefore, may be recovered by the Trustee from the Respondents, jointly and severally. The same is true of the expenses of $636.09 which are itemized on page 18 of the Trustee's application.

    5.   Respondents' Objections

There is no support for Respondents' assertion that the Trustee lacks standing to make a claim against the Respondents. As part of his duties, a chapter 7 trustee is charged with "investigating the financial condition of the debtor," and "collecting and reducing to money the property of the estate." 11 U.S.C. § 704(a)(1), (4). Initiating adversary proceedings on behalf of the estate in good faith falls within the ambit of these duties. <u>In re McKenzie</u>, ---B.R.----, 2012 WL 2420773, at *5 (E.D. Tenn. 2012). A trustee may retain counsel for aid in discharging his duties. <u>McDaniel v. Blust</u>, 668 F.3d 153, 157 (4th Cir. 2012) (trustee and trustee's counsel's role includes "recovering assets of the estate") (quoting <u>Heavrin v. Schilling (In re Triple S</u>

- 41 -

Rests.), 519 F.3d 575, 578 (6th Cir. 2008)). In order to protect the estate and discharge his duties, a trustee has standing to bring claims against third parties. Henkel v. Lickman (In re Lickman), 301 B.R. 739, 747 (Bankr. M.D. Fla. 2003). The IMGT attorneys were retained to prosecute the adversary proceeding that the Trustee filed against the Respondents. The Court of Appeals found that in prosecuting that adversary proceeding, the IMGT attorneys were acting in furtherance of the Trustee's duty to recover property of the estate and as official representatives of the Trustee. McDaniel v. Blust, 668 F.3d 153, 157 (4th Cir. 2012). The IMGT action was a hindrance and impediment to the ability of the Trustee and his counsel to prosecute the adversary proceeding and thereby fulfill his duty to recover property of the estate. In a sense, the IMGT action was an attack upon the Trustee being able to perform an essential duty. In order to protect the estate from Respondents' interference with the performance of that duty, it was incumbent on the Trustee to oppose the IMGT action and he clearly had standing to do so. The Trustee sought and obtained authority to employ special counsel to represent the Trustee and the Trustee Law Firm Defendants with respect to the IMGT action and in matters ancillary and coincident to the IMGT action. The Trustee now clearly has standing to pursue a claim to recover the attorneys' fees of the special counsel that he employed to defend against the challenge to the Trustee and his attorneys performing essential

duties on behalf of the bankruptcy estate.

Respondents argue that claim preclusion bars the Trustee's claim for damages resulting from their violation of the Barton Doctrine. They assert that the Trustee's claim is barred because the claim was not asserted in the District Court or in the Court of Appeals. The Trustee, of course, was not a party to the proceedings in the District Court or the Court of Appeals and hence could not have asserted a claim in those proceedings. Moreover, claim preclusion or res judicata requires that there have been a judgment on the merits in the prior proceeding. Montana v. United States, 440 U.S. 147, 153, 99 S. Ct. 970, 973, 59 L. Ed. 2d 210, 216-17 (1979). Where, as in the IMGT action, a lack of subject matter jurisdiction forms the basis of a court's dismissal, there is no judgment on the merits of the case. Shaw v. Merritt-Chapman & Scott Corp., 554 F.2d 786, 789 (6th Cir. 1977)(citing Am. Sur. Co. v. Baldwin, 287 U.S. 156, 166, 53 S. Ct. 98, 102, 77 L. Ed. 231, 238 (1932)). Without a judgment on the merits, claim preclusion does not arise. Kasap v. Folger Nolan Fleming & Douglas, Inc., 166 F.3d 1243, 1248 (D.C. Cir. 1999). A dismissal for lack of subject matter jurisdiction thus supports preclusion only with respect to the jurisdictional issue decided by the court. Id. As the court explained in Kasap, "dismissals for lack of jurisdiction are not decisions on the merits and therefore have no res judicata effect on subsequent attempts to bring suit in a court

of competent jurisdiction." <u>Id.</u>  The District Court's dismissal of the IMGT action was based solely on lack of subject matter jurisdiction.  It follows that the Respondents are not entitled to invoke claim preclusion as a bar to the Trustee asserting a claim for damages in this proceeding.

The Respondents assert that the Trustee should not be able to assert a damages claim because the estate suffered no damages as a result of their violation of the Barton Doctrine.  They further assert that any damages would not be an administrative expense because the estate did not benefit from the defense of the IMGT action.  Neither of these assertions has merit.

A special counsel employed by a trustee is paid by the estate, thereby increasing the estate's liabilities.  <u>In re McKenzie</u>, 453 B.R. 737, 742-43 (Bankr. E.D. Tenn. 2011).  The Code "authorizes compensation to three types of persons: trustees, examiners, and § 327 professional persons."  <u>Lamie v. U.S. Trustee</u>, 540 U.S. 526, 534, 124 S. Ct. 1023, 1030, 157 L. Ed. 2d 1024, 1034 (2004).  Following a bankruptcy court's approval, section 327(e) authorizes a trustee to employ special counsel possessing a specified scope of employment.  11 U.S.C. § 327(e).  Special counsel employed pursuant to section 327(e) may be reasonably compensated from the estate for services provided within the scope of the order allowing the employment.  <u>See In re Engel</u>, 124 F.3d 567, 590 (3d Cir. 1997).  <u>In re McKenzie</u> recently tackled the issue of who was liable for

special counsel's fees.  In McKenzie, after a creditor sued the trustee for malicious prosecution and abuse of process, the trustee sought to hire special counsel to handle his defense.  453 B.R. at 740.  The creditor objected to the trustee paying special counsel using estate funds.  Id.  After noting a dearth of authority in both case law and treatises regarding who pays the special counsel's fees, the bankruptcy court canvassed the immunity and Barton Doctrine cases expounding the importance of protecting trustees from disgruntled parties seeking to derail the trustee's administration of the estate.  Id. at 740-42.  Relying heavily on the policy of protecting trustees, the court found that the special counsel should be paid from the estate like any other professional authorized by section 327. Id. at 742-43.  The potential benefits to an estate from a special counsel defending a trustee or his counsel strongly support the court's conclusion in McKenzie that the compensation of special counsel employed to defend a trustee or his professional should be treated as an administrative expense. Pursuant to section 323 of the Bankruptcy Code, a trustee is the representative of the debtor's estate.  Henkel v. Lickman (In re Lickman), 301 B.R. 739, 747 (Bankr. M.D. Fla. 2003).  As the estate's representative, a trustee may request reimbursement for the actual and necessary costs of preserving the debtor's estate. 11 U.S.C. § 503(b)(1)(A).  In Reading Co. v. Brown, the Supreme Court held that "the negligence of a receiver acting within the

scope of his authority as a receiver give[s] rise to 'actual and necessary costs....'" 391 U.S. 471, 485, 88 S. Ct. 1759, 1767, 20 L. Ed. 2d 751, 759 (1968). Accordingly, liabilities arising from actions taken by the trustee within the scope of a trustee's authority are payable by the estate as administrative expenses pursuant to section 503(b)(1)(A). Indust. Comm'n of Ariz. v. Solot (In re Sierra Pac. Broadcasters), 185 B.R. 575, 578 (B.A.P. 9th Cir. 1995). The policy underlying this administrative expense priority was explained by the Court of Appeals for the Fourth Circuit:

> Paying legal obligations is necessary and beneficial in the sense that it allows the receiver or the liquidator to conduct the ongoing business of selling assets and distributing claims in an orderly manner. The legal obligations that arise as a result of this ongoing business are properly considered administrative expenses.

N.C. ex rel. Long v. United States, No. 97-2108, 1998 WL 178374, at *4 (4th Cir. April 16, 1998). Relying on Brown, the Bankruptcy Appellate Panel for the Ninth Circuit found that a discovery sanction against a trustee and trustee's counsel was an actual and necessary expense. Goode-Parker v. Siegel (In re Goode-Parker), No. 06-1408, 2007 WL 7532276, at *8-9 (B.A.P. 9th Cir. June 14, 2007).

In this case, the Trustee obtained authority to employ the Brooks Pierce firm as special counsel to represent the Trustee and the attorneys who were assisting him in pursuing claims that were

property of the bankruptcy estate and which the Trustee had a duty to pursue and also to protect the estate from a potential administrative expense claim posed by the allegations against the Trustee's attorneys in the IMGT action. The services provided by special counsel were necessary to protect the Trustee and the bankruptcy estate. Without compensating special counsel employed to represent a trustee or his professionals as an administrative expense, the trustee's and his professionals' job would become more onerous, exactly the result the Court of Appeals warned against in affirming the dismissal of the IMGT action. <u>McDaniel v. Blust</u>, 668 F.3d 153, 157 (4th Cir. 2012) (citations omitted). As reflected in the foregoing authorities, attorneys' fees incurred as a result of such services by special counsel give rise to an administrative claim against the bankruptcy estate which, as illustrated in this case, can be a substantial liability on the part of the bankruptcy estate. The creation of such administrative claims against the bankruptcy estate obviously harms the estate and gives rise to a claim by the estate to be reimbursed by the parties whose wrongful conduct proximately caused the estate to incur the liability.

The Respondents assert that the proper avenue for seeking damages requires application of Rule 11 of the Federal Rules of Civil Procedure and Bankruptcy Rule 9011 and argue that no relief is available because the requirements pursuant to those rules have

not been met.  This argument also is without merit.  A bankruptcy court's power to assess damages for a Barton Doctrine violation is distinct and independent of Rules 11 and 9011.  A bankruptcy court, like other federal courts, has the inherent power to impose sanctions.  Ginsberg v. Evergreen Sec., Ltd. (In re Evergreen Sec., Ltd.), 570 F.3d 1257, 1273 (11th Cir. 2009).  Such inherent power is distinct and independent of Rules 11 and 9011.  Id. Rules 11 and 9011 have not displaced the inherent power of the courts to impose sanctions.  Chambers v. NASCO, Inc., 501 U.S. 32, 48-49, 111 S.Ct. 2123, 2136-37, 115 L.Ed. 2d 27, 47 (1991).  Also, section 105(a) authorizes a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."  11 U.S.C. § 105(a).  A bankruptcy court's power to assess damages for a Barton Doctrine violation comports with "[the] strong interest in protecting [a trustee] from unjustified personal liability for acts taken within the scope of his official duties."  McDaniel v. Blust, 668 F.3d 153, 157 (4th Cir. 2012) (citations omitted).  A number of courts have assessed damages for Barton Doctrine violations without employing a Rule 11 analysis. See Unencumbered Assets Trust v. Hampton-Stein (In re Nat'l Century Fin. Enters., Inc.), 426 B.R. 282, 295-96 (Bankr. S.D. Ohio) (listing cases).  It follows that, independent of Rules 11 and 9011, this court has the authority to assess damages against

the Respondents for violations of the Barton Doctrine. The Trustee was not required to invoke Rules 11 and 9011 and did not do so and, therefore, there was no requirement that the Trustee follow the procedure described in those rules in seeking to recover from the Respondents.

The Respondents urge that the assessment of damages covering the fees of Brooks Pierce is unnecessary because the fees were paid by the malpractice insurance carrier for the Trustee and his law firm. This objection requires consideration of the collateral source rule. Under the collateral source rule, a plaintiff's recovery will not be diminished by benefits received from a source independent of the wrongdoer. E.g., Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525, 534 (9th Cir. 1962). The policy underlying the rule focuses on the inherent unfairness of improving the defendant's position through consideration of payments made independently to the plaintiff. Id. The Federal common law includes the collateral source rule. Hartnett v. Reiss Steamship Co., 421 F.2d 1011, 1016 n.3 (3d Cir. 1970), cert. denied, Grain Handling Co. v. Hartnett, 400 U.S. 852, 91 S. Ct. 49, 27 L. Ed. 2d 90. At least one bankruptcy court has determined that the collateral source rule applies to preclude diminishment of sanctions damages including attorney fees. In re Briggs, 143 B.R. 438, 463-64 (Bankr. E.D. Mich. 1992). In Briggs, the creditor sought a reduction in the attorney fees assessed as

sanctions based on the debtor having obtained legal representation pursuant to a legal services plan.  Id. at 463.  The debtor had purchased the plan in advance of the bankruptcy as an employee benefit.  Id.  Invoking the collateral source rule, the court found that the sanctioned party should not benefit from the debtor having available insurance obtained by the debtor through his employer.  Id.  These same considerations are applicable in this case.  The Trustee and his law firm paid the price required to purchase malpractice insurance which was completely independent of the Respondents.  The payments cited by the Respondents are the proceeds from a collateral source.  Pursuant to the collateral source rule, the Respondents should not be relieved of responsibility for their wrongful conduct as a result of the payments which were in no way contributed to by the Respondents. Respondents' argument also ignores the prospect of the insurance carrier being subrogated to the administrative claim arising from the services provided by Brooks Pierce.

The Respondents argue that their actions in contravention of the Barton Doctrine involved good faith and vigorous pursuit of litigation.  Because their appeal was not deemed frivolous and oral argument was allowed, the Respondents argue that their conduct was in good faith.  Additionally, they argue that their good faith is evidenced by opinions obtained from a legal ethics professor that the Trustee and members of his firm had a legal

duty to not represent that the tax documents were complete and correct. This effort by the Respondents to cast their intentional and continuing violation of the Barton Doctrine in a favorable light is unconvincing and must be rejected for two important reasons. First, the court does not find that the Respondents acted in good faith in filing the IMGT action and continuing to pursue it until their petition for en banc review in the Court of Appeals was rejected. When the conduct of the Respondents in this case is viewed in its entirety, it appears instead that by suing the IMGT attorneys based on conduct that according to the Respondents' own allegation "occurred incidental to the adversary proceeding," the Respondents sought to frustrate and impede the prosecution of the adversary proceeding that the Trustee had filed against Respondents McDaniel and Epes.

Second, even if the Respondents could claim good faith in filing the IMGT action, such would not be a valid defense against the Trustee's claim. The courts have rejected an exception to Barton Doctrine violations based upon asserted good faith. In *In re Amir*, No. 08-13700, 2009 WL 1748701, at *4 (Bankr. N.D. Ohio June 18, 2009), the party who brought the proceeding against the trustee and his counsel in state court continued to litigate the issue after learning of potential liability arising from violations of the Barton Doctrine. The bankruptcy court rejected a "vigorous representation" defense to the Barton Doctrine

violations.   Id.   Because the violators were aware of the potential sanctions and chose to assume the risk of greater damages by continuing to litigate, the court neither extinguished nor mitigated the damages.   Id.; see also In re McKenzie, No. 08-16378, 2012 WL 1115981, at *9 (Bankr. E.D. Tenn. Mar. 30, 2012) (Barton Doctrine violator assumed risk of compensatory sanctions by continued prosecution of state court proceeding).   Courts also have rejected the defense of reliance on third parties' opinions. See Heavrin v. Schilling (In re Triple S Rests.), 519 F.3d 575, 579 (6th Cir. 2008).   More generally, the Court of Appeals for the Fourth Circuit cautioned against weakening the Barton Doctrine. "'Without the requirement [of obtaining leave], trusteeship w[ould] become a more irksome duty, and so it w[ould] be harder for courts to find competent people to appoint as trustees. Trustees w[ould] have to pay higher malpractice premiums, and this w[ould] make the administration of the bankruptcy laws more expensive.'"   McDaniel v. Blust, 668 F.3d 153, 157 (4th Cir. 2012) (quoting In re Linton, 136 F.3d 544, 545 (7th Cir. 1998)).

In this case, the Respondents received notice of their violation on August 9, 2009, when the defendants sought to dismiss the IMGT action for lack of subject matter jurisdiction.   At that point, the Respondents were on notice that they were not entitled to proceed against the IMGT attorneys without seeking leave to do so.   Instead of backing off, the Respondents attempted to remand

the IMGT action to state court. They then litigated their
violation before Magistrate Judge Sharp, Chief District Judge
Beaty, and the Court of Appeals for the Fourth Circuit, including
a request for a rehearing en banc after the Fourth Circuit had
affirmed the dismissal of the IMGT action. The Respondents thus
knowingly chose to assume the risk of continued litigation and
potential accompanying damages by doggedly pursuing the IMGT
action.  If the leeway sought by the Respondents were allowed, the
Barton Doctrine would be greatly diminished and the harm to the
bankruptcy process described by the Court of Appeals would be much
more likely to occur.

The Respondents seek to mitigate any damages that might be
awarded by arguing that their filing of the IMGT action actually
benefitted the bankruptcy estate because the institution of the
IMGT action was necessary to prod the Trustee into clarifying that
the "tax documents" were not the actual tax returns of the
Debtors.  This assertion is not supported by the evidence and is
rejected.  The evidence did not show that the filing of the IMGT
action in any way helped to resolve the brouhaha that was
orchestrated by the Respondents themselves regarding the tax
documents or that it had any other positive effect.  Even if the
Respondents were attempting to obtain clarification regarding the
tax documents, which does not appear to be the case given the
nature and tone of the accusations contained in the complaint in

- 53 -

the IMGT action, the Respondents do not address why they could not have secured this same result after properly seeking leave to sue the IMGT attorneys.

The Respondents also vigorously attack the fee applications and time records of the Trustee and the attorneys. The Respondents focus on some inconsistencies between the original and the subsequent fee application of the IMGT attorneys as evidence of a failure to keep contemporaneous time records. Specifically, they highlight that the Trustee decreased the travel expenses of the IMGT attorneys after cross examination. The Respondents also list a number of small errors such as the use of the wrong year when referencing a tax return or referencing the incorrect party when noting a contempt motion. Lastly, they assert that many of the services described for both the Trustee and his attorneys as well as Brooks Pierce are lumped because a number of different services are listed in single time entries without specific time allocations for each service.

The services and fees of the IMGT attorneys are described in an application (D.E. #522) filed after the  hearing on April 25, 2012. Although there are some differences between the amounts enumerated at hearing on April 25, 2012, and the services described in the subsequent application and also some lumping in the applications, the evidence taken as a whole is sufficient for the court to make a finding as to the nature and extent of the

  
services that were provided and to determine the reasonableness of the fees sought for such services. See In re Downs & Assocs., Ltd., No. 02-32905, 2002 WL 3213902, at *3 (Bankr. W.D.N.C. Dec. 11, 2002). Moreover, the evidence does not show, as contended by the Respondents, that the attorneys did not maintain contemporaneous time records as the services were being performed. To the extent that there are inconsistencies between the evidence at the hearing and the later application submitted by IMGT and some errors in dates, etc., these discrepancies are not of the type or magnitude of those involved in In re Dilieto, 468 B.R. 510 (Bankr. D. Conn. 2012), a decision relied upon by the Respondents. In Dilieto, the chapter 7 trustee failed to use contemporaneous billings, billed for unnecessary time and fabricated billings. Id. at 529-35. Additionally, the trustee in that case fabricated supplemental time records as part of a scheme to obtain the maximum allowable commission. Id. at 535-36. Nothing in the evidence in the present case would support a finding that there was any such conduct in the present case on the part of the Trustee, the Brooks Pierce attorneys or the IMGT attorneys.

In summary, having considered the foregoing objections as well as the other objections presented by the Respondents, the court is satisfied that the objections lack merit and therefore are overruled and denied. The court also has considered the Respondents' request that a further hearing be held to address

issues they wish to raise concerning the supplemental fee
application that was filed by the Trustee.  The court afforded the
Respondents an opportunity to file a written response to the
supplemental fee application and the Respondents have done so.
The court has carefully considered the responses that were filed
by the Respondents.  The Respondents also submitted an affidavit
from Mr. McDaniel in response to the supplemental fee application
which the court has considered, as well.  The court is satisfied
that the Respondents have been afforded a full and fair
opportunity to respond to and be heard regarding the claim
asserted by the Trustee and that no further hearing is required in
order to afford due process to the Respondents.  Accordingly, no
further hearing will be held before a decision is rendered.

     6.  Conclusion

     Based upon the foregoing, the court concludes that Charles M.
Ivey, III, as Chapter 7 Trustee for EBW, Inc. and EBW Laser, Inc.,
is entitled to have and recover from James Mark McDaniel, C.
Richard Epes and Douglas S. Harris, jointly and severally, the sum
of $320,980.23 based upon the fees and expenses of Brooks Pierce
in the amounts of $244,176 and $5,048.79, and the fees and
expenses of IMGT in the amounts of $71,119.35 and $636.09.

     This 14th day of August, 2012.

                         William L. Stocks
                         _____
                         WILLIAM L. STOCKS
                         United States Bankruptcy Judge

                         - 56 -

ADDENDUM NO. 1

1.    On June 11, 2009, Respondents filed their complaint initiating the IMGT Lawsuit in Guilford County Superior Court. See Exhibit 1 to the Motion for Relief at D.E. 419-1.

2.    On July 13, 2009, the defendants in the IMGT Lawsuit (the "Trustee Law Firm Defendants") removed that action to the United States District Court for the Middle District of North Carolina.  See IMGT Lawsuit, Case No. 1:09-cv-507 ("District Ct.") at Docket # 1.  On August 10, 2009 the Trustee Law Firm Defendants moved to dismiss the IMGT Lawsuit for lack of subject matter jurisdiction due to Respondents' contravention of the Barton Doctrine.  See Exhibits 5 & 6 to the Motion for Relief, D.E. 419-5 & 419-6.

3.    On August 11, 2009 -- though McDaniel, Epes and Attorney Harris were now unequivocally on notice of the existence of the Barton Doctrine -- they nonetheless filed a motion to remand the IMGT Lawsuit to State Court.  See IMGT Lawsuit, District Ct. at Docket ## 11-12 (Motion to Remand and supporting Brief with exhibits).

4.    On September 2, 2009, McDaniel and Epes, through Attorney Harris, filed a Brief in Opposition to the Trustee Law Firm Defendants' Motion to Dismiss.  See Exhibit 9 to Motion for Relief, D.E. 419-11.

5.    The next day, September 3, 2009, the Trustee Law Firm Defendants filed a Brief in Opposition to Respondents' Motion to Remand.  See Exhibit 10 to Motion for Relief, D.E. 419-13.

6.    On September 17, 2009, the Trustee Law Firm Defendants filed a Reply Brief in support of their Motion to Dismiss.  See Exhibit 11 to Motion for Relief, D.E. 419-14.

7.    On September 18, 2009, Attorney Harris filed McDaniel and Epes' Reply Brief in support of their Motion to Remand the IMGT Lawsuit to State Court.  See Exhibit 12 to Motion for Relief, D.E. 419-15.

8.    On September 21, 2009, McDaniel and Epes instituted a lawsuit in Guilford County Superior Court against Bernard Robinson & Company, LLC because Bernard Robinson had previously provided the Trustee Law Firm Defendants with documents pertaining to EBW Laser, Inc., the Debtor in this case.  See Exhibit 1 to the (first) Supplement to the Trustee's Motion for Relief, D.E. 424 & 424-1 (filed 11/09/09).

9.  On October 16, 2009, the Trustee filed his Motion for Relief with this Court.  See D.E. 419 to 419-18.

10.  On November 9, 2009, the Trustee filed his Supplement to the Relief Motion alleging a continued willful violation of the Barton Doctrine by the Respondents through their institution of suit against Bernard Robinson for its providing documents to the Trustee's attorneys.  See D.E. 424 to 424-1.

11.  On November 16, 2009, Attorney Harris filed his initial response to the Motion for Relief.  See D.E. 426.  On that same date, McDaniel and Epes, through Attorney Culbertson, filed their separate responses to the Motion for Relief and the Supplement.  See In re EBW, Inc. (Case No. 05-10221) at Docket ## 184 & 185.

12.  On December 8, 2009, this Court entered an Order staying the portion of the Relief Motion arising out of the alleged violation of the Barton Doctrine.  See D.E. 431.

13.  On January 8, 2010, United States Magistrate Judge P. Trevor Sharp entered his recommendation regarding the Trustee Law Firm Defendants' Motion to Dismiss.  Judge Sharp recommended that McDaniel and Epes' claims against the Trustee Law Firm Defendants be dismissed due to their violation of the Barton Doctrine while also recommending that codefendant William Stanaland's Motion to Dismiss be denied and that claim against Mr. Stanaland be remanded to Guilford County Superior Court for further proceedings.

14.  On January 22, 2010, Attorney Harris submitted McDaniel and Epes' objection to Judge Sharp's recommendation.  See IMGT Lawsuit, District Court at Docket # 24.

15.  On January 27, 2010, the Trustee and Attorney Harris filed their respective pretrial disclosures in connection with the scheduled hearing on whether Attorney Harris violated the Permanent Injunction requiring him not to communicate with McDaniel and Epes regarding the Trustee Recovery Litigation.  See D.E. 442-43.

16.  On February 3, 2010, an evidentiary hearing to "show cause" is held before this court.  See D.E. 446-47 (Transcript & Notice of Filing).

17.  On February 8, 2010, the Trustee Law Firm Defendants responded in opposition to McDaniel and Epes objection to Judge Sharp's recommendation.  See IMGT Lawsuit, District Ct. at Docket # 26.

- 2 -

18.   On March 5, 2010, Attorney Harris and the Trustee submitted their respective post-hearing briefs regarding whether Harris should be held in civil contempt for violating this Court's previous injunction.  See D.E. 450 & 451, respectively.

19.   On March 15, 2010 Attorney Harris filed a brief in response to the Trustee's post-hearing brief.  See D.E. 456.

20.   On March 19, 2010 the Trustee filed a Reply Brief with exhibits in response to Attorney Harris' opposition brief. See D.E. 459 to 459-2.

21.   On March 31, 2010, Chief District Court Judge Beaty entered an order adopting Judge Sharp's recommendation of dismissal and, consequently, also entered a Judgment of Dismissal in favor of the Trustee Law Firm Defendants.  See Exhibit 1 to the Trustee's Second Supplement to his Relief Motion, D.E. 484 & 484-1.

22.   On April 12, 2010, McDaniel and Epes, through Attorney Harris, filed a Rule 60 Motion for Relief, with exhibits and a supporting brief, seeking relief from the Judgment of Dismissal. See IMGT Lawsuit, District Ct. at Docket ## 30 & 31.

23.   On May 6, 2010, the Trustee Law Firm Defendants filed their Brief in Opposition to Respondents' Rule 60 Motion.  See IMGT Lawsuit, District Ct. at Docket # 32.

24.   On May 24, 2010, McDaniel and Epes, through Attorney Harris, filed a Reply Brief in support of their Rule 60 Motion. See IMGT Lawsuit, District Ct. at Docket # 33.

25.   On June 8, 2010, Chief District Court Judge Beaty entered an order denying Respondents' Rule 60 Motion for Relief. See Exhibit 2 to the Trustee's Second Supplement to Relief Motion, D.E. 484-2.

26.   On July 8, 2010, Attorney Harris filed McDaniel and Epes' Notice of Appeal of the District Court's Judgment of Dismissal and Order Denying Rule 60 Relief.  See IMGT Lawsuit, District Ct. at Docket # 35.

27.   On July 26, 2010, the Fourth Circuit ordered that a mediation be held in connection with the appeal of the IMGT Lawsuit.  See IMGT Lawsuit, Fourth Circuit proceedings (Case No. 10-1776) at Document 00412904956.

28.   Subsequently, on November 14, 2010 a mediation session

was held in Greensboro.

29.  On December 1, 2010, a second day of mediation was held, again in Greensboro.  The mediation ended that day in an impasse.

30.  On January 7, 2011, Attorney Harris filed McDaniel and Epes' Brief in support of their appeal with the Fourth Circuit. See IMGT Lawsuit, Fourth Circuit proceedings at Document 20. They also submit their Appendix on this same date. See id. at Document 23.

31.  On or about January 20, 2011, Attorney Harris issues a deposition subpoena to John Blust in conjunction with the proceedings in the IMGT Lawsuit on remand against William Stanaland.  See Exhibit 6 to Second Supplement to Relief Motion, D.E. 484-6.

32.  On February 4, 2011, Attorney Harris proceeded to depose Mr. Blust.  See Exhibit 7 to Second Supplement , D.E. 484-7 (Blust deposition transcript); see also Second Supplement at ¶ 2 0-25 (pp. 13-19), D.E. 484.  Most of Attorney Harris' examination of Blust relates to matters that were at issue in the Trustee Recovery Litigation.  Id.

33.  On February 11, 2011, the Trustee Law Firm Defendants filed their Appeliee's Brief with the Fourth Circuit.  See IMGT Lawsuit, Fourth Circuit proceedings at Document 24.

34.  On February 28, 2011, Attorney Harris, filed McDaniel and Epes' Reply Brief in support of their appeal.  See IMGT Lawsuit, Fourth Circuit proceedings at Document 26.

35.  On or about June 6, 2011, Attorney Harris issued trial subpoenas to Trustee Law Firm Defendants Blust and Siegmund for them to appear at the trial of the remanded claims against Stanaland in the IMGT Lawsuit that was scheduled for the Superior Court session beginning June 13, 2011.  See Exhibit 5 to Second Supplement, docket entry 4845.

36.  On June 13, 2011, the trial of McDaniel's claims against Stanaland in the IMGT Lawsuit commences in Guilford County.  See Second Supplement at ¶ 15-17 (pp. 8-13) D.E. 484. During this trial, Attorney Harris calls McDaniel to testify during both McDaniel's case in chief and on rebuttal.  During his examinations, Attorney Harris questions McDaniel about numerous topics which the Trustee contends involved the Trustee Recovery Litigation in violation of the preliminary and permanent

injunctions in the Harris Proceeding.

37.   On July 28, 2011, the Trustee filed his Second Supplement to the Relief Motion asserting additional violations of the Harris injunction by Mr. Harris. See D.E. 484 to 484-8.

38.   On or about September 12, 2011, Attorney Harris attempted to submit extensive supplemental authorities to the Fourth Circuit.

39.   On September 14, 2011, however, the Fourth Circuit enters an order, sua sponte, striking McDaniel and Epes' purported supplemental authorities.  See IMGT Lawsuit, Fourth Circuit proceedings at Document 33.

40.   On October 7, 2011, the Fourth Circuit issues notification that it will hear oral arguments in the IMGT Lawsuit on December 9, 2011.

41.   On December 9, 2011, the Fourth Circuit hears arguments on McDaniel and Epes' appeal.

42.   On February 7, 2012 this Court sets a hearing with respect to the Motion for Relief for April 3, 2012.  See D.E. 502.

43.   On February 9, 2012, the Fourth Circuit issued a published opinion affirming the dismissal of the claims against the Trustee Law Firm Defendants in the IMGT Lawsuit.  See IMGT Lawsuit, Fourth Circuit proceedings at Document 38 (Opinion), copy attached as Exhibit 2, and Document 39 (Judgment).

44.   On February 23, 2012, McDaniel and Epes, through Attorney Harris, petitioned the Fourth Circuit for rehearing en banc. See Id. at Document 40.

45.   On March 6, 2012, the Fourth Circuit denied McDaniel and Epes' Petition for Rehearing and subsequently issues the Mandate in that case on March 14, 2012.  See Id. at Documents 42, 43.

ADDENDUM NO. 2

| DATE | RATE | HOURS | AMOUNT |
|------|------|-------|--------|
| 09/08/09 | 240 | .90 | 216.00 |
| 11/09/09 | 240 | .30 | 72.00 |
| 11/17/09 | 240 | .40 | 96.00 |
| 11/18/09 | 240 | 1.10 | 264.00 |
| 11/18/09 | 200 | 3.80 | 760.00 |
| 11/19/09 | 200 | 2.80 | 560.00 |
| 11/20/09 | 200 | 3.30 | 660.00 |
| 11/23/09 | 240 | 3.60 | 864.00 |
| 11/23/09 | 200 | 2.90 | 580.00 |
| 11/23/09 | 240 | .50 | 120.00 |
| 11/24/09 | 240 | .40 | 96.00 |
| 11/24/09 | 240 | 2.00 | 480.00 |
| 11/24/09 | 200 | 2.30 | 460.00 |
| 11/24/09 | 240 | 1.10 | 264.00 |
| 12/14/09 | 200 | 3.80 | 760.00 |
| 01/14/10 | 240 | 3.70 | 888.00 |
| 01/25/10 | 240 | 1.30 | 312.00 |
| 01/27/10 | 240 | 1.60 | 384.00 |
| 01/28/10 | 240 | .90 | 216.00 |
| 01/28/10 | 240 | 2.60 | 624.00 |
| 01/28/10 | 200 | .80 | 160.00 |
| 01/29/10 | 240 | 2.00 | 480.00 |
| 02/01/10 | 240 | 2.60 | 624.00 |
| 02/02/10 | 240 | 4.00 | 960.00 |
| 02/02/10 | 240 | .40 | 96.00 |
| 02/02/10 | 200 | 2.20 | 440.00 |
| 02/02/10 | 240 | 1.10 | 264.00 |

| | | | |
|---|---|---|---|
| 02/03/10 | 240 | 4.00 | 960.00 |
| 02/03/10 | 240 | .40 | 96.00 |
| 02/03/10 | 200 | 3.10 | 620.00 |
| 02/04/10 | 200 | 1.90 | 380.00 |
| 02/09/10 | 240 | 1.30 | 312.00 |
| 03/04/10 | 240 | .50 | 120.00 |
| 03/05/10 | 240 | 2.90 | 696.00 |
| 03/05/10 | 240 | 1.30 | 312.00 |
| 03/16/10 | 240 | .90 | 216.00 |
| 03/16/10 | 200 | 1.20 | 240.00 |
| 02/04/11 | 200 | 2.60 | 520.00 |
| 03/23/11 | 240 | 1.80 | 432.00 |
| 03/24/11 | 240 | 3.60 | 864.00 |
| 06/22/11 | 240 | 1.80 | 432.00 |
| 06/23/11 | 240 | 1.60 | 384.00 |
| 03/07/12 | 275 | 2.80 | 770.00 |
| 03/08/12 | 275 | 1.40 | 385.00 |
| | | | |
| TOTALS: | | 85.50 | 19,439.00 |
| | | | |
| | | | |
| | | | |

PARTIES IN INTEREST


Edwin R.Gatton, Esq.
Charles M. Ivey, III, Esq.
P.O. Box 3324
Greensboro, NC 27402


Jeffrey E. Oleynik, Esq.
P.O. Box 26000
Greensboro, NC 27420


Krispen Culbertson, Esq.
315-F Spring Garden Street
Greensboro, NC 27401


Douglas S. Harris, Esq.
1698 Natchez Trace
Greensboro, NC 27455


Michael D. West, Bankruptcy Administrator